Please be seated and good morning, everyone. Welcome to the Ninth Circuit. As I always say to the lawyers appearing before us, there is no extra credit, no bonus points for using all of your time. So if you've made your points and you're not getting any questions back from us, it's OK to sit down. So just always keep that in mind as an advocate. With that, we've got two cases for argument today. We've got five. We've got four submitted. First case is Brown. Counsel, you ready? And first, come on up. I just want to thank you. I want to thank your office for taking these cases. You know, some federal offender's office don't. You guys are plenty busy and you step up and do so just right off the bat. I want to thank you for doing that. Well, I appreciate that. You may proceed. Good morning, Your Honors. May it please the court. Daniel Lemmer on behalf of petitioner appellant Lavar Brown. With your honor's permission, I'd like to reserve three minutes for rebuttal. I'll keep track of the clock. Very good. Thank you. In this case, the jury was prevented from hearing evidence of an alternate suspect who had been harassing the victim and his family in the weeks before the murder because he thought there were gang involved. This included confronting and maybe assaulting the victim the day before the crime using the same words the killer did. The victim's brother told police that the shooter looked like and sounded similar to this alternate suspect. And the suspect was later found with a gun that matched the description of the murder weapon. When police questioned him, he knew that the killer dropped a set of keys at the scene, which was information that had not been released to the public. Mr. Brown ultimately had four trials and at the third, the jury hung because it heard just a little bit of this evidence. At that trial, the victim's brother, who was one of the key witnesses, testified that he witnessed a local gang member confronting his brother at his car and asking him where he was from just days before the crime. He also testified that his brother and his sister, his family, were being harassed by gang members every time they went outside. Was your client prevented altogether from suggesting that someone else might be the perpetrator? Or was it he only prevented from suggesting that Hughley specifically? I believe that it doesn't matter. I think it does really matter here, Your Honor. And I believe the court's words were something to the effect of you can say that someone else committed the crime, but you can't say a specific person committed the crime. That makes a really, really big difference. I think Bradford has some nice language about this, about how a genuine alternate suspect is kind of the missing link for the jury that really allows them to feel like there is a reasonable doubt about this. Because a defense that just says, you know, some other guy did this, that's pretty vague. That's kind of what Mr. Brown ultimately had here in this fourth trial. A defense that says it's this other guy. He did it. And here's some evidence that suggests that. That's really much, much stronger. Chris, it seems like the difference here versus Bradford is that here you have all these other pieces of evidence. You have the DNA evidence. You have the keys. You have an eyewitness identification. So, I mean, why isn't that enough? Your Honor, this is where I think it's a lot of the other cases along this line are very helpful. There's always some piece of evidence that explains why the defendant got convicted in the first place. I mean, for example, Lunbury. The defendant confessed to the crime. Cudjoe. The defendant's DNA is found on the victim, and there are footprints leading from her house to his trailer, where he gets found two hours after the crime is committed, I believe. Holmes, I think, is maybe the best one. Because in that case, the defendant's palm print was found inside the victim's house. There were fibers consistent with his clothing on the victim's body. Her blood was on his shirt. Her DNA was in his underwear. And there was a witness who said, I saw the defendant in the area about an hour before police thought the crime happened. So, yes, there was some evidence that pointed to Mr. Brown here. I mean, those are his keys. They opened the door to his apartment. He definitely owned a car that was the car used in the crime, or at least was very, very similar. But there's also some quite strong evidence that places this other suspect, Mr. Hewley, as being involved, as him harassing the family. And he really kind of fills this hole in the prosecution's theory of the case, because there's no evidence that comes forward to explain why LeVar Brown, who lives on the other side of town, is in South Central Los Angeles on a Sunday morning killing Claudio Johnson because he thought he was in a gang. No, there was this one police officer who testified that he remembered a traffic stop three years ago where he says he asked Mr. Brown if he was in a gang and Mr. Brown said yes. Now, he never documented that. He says he didn't even think about it in the time between when this stop happened and when he was contacted by the lead detective on the case. But he says he does remember that Mr. Brown said yes. He never said which gang, which would be pretty relevant to this situation. But there's also Mr. Brown's ex-girlfriend, who knows him quite a bit better than this police officer, who says we dated for years. We lived together. We have a daughter. I never knew him to be involved in a gang. I never saw him in the company of gang members. And then, of course, we have Mr. Hughley, who at least according to the victim's family, he hangs out across the street at the liquor store all day asking people where they're from. He's a member of the Five Nine Hoovers, which is the neighborhood gang. And he specifically got a thing for the Johnson family because they just moved into the neighborhood. He's convinced that the Johnson twins are maybe from a rival gang. And he's also upset because he tried to get their sister's number, and she gave him an old one that had been disconnected. And so in the police interviews, Claudius, the victim's twin brother, is telling police, oh, yeah, you know, I saw Hughley riding down the street calling out for my sister. He came up to our windows. He'd been asking my brother where he's from all the time. He confronted him in his car. Apparently, his brother told his girlfriend that Hughley actually pulled a gun during that conversation or conversation is maybe one way to put it. Let me jump in here because for me, the standard of review in this case is very important. Yes. So in Bradford, it was straight Brecht analysis. What is it in this case? I would say it's also that as to prejudice. And why would we not apply like the double? Some cases say you just apply Brecht. Some cases you apply Brecht and EDPA. Why is this not that? So because this is a constitutional violation, Mr. Brown's right to meaningful opportunity to present a complete defense was violated by the exclusion of this evidence. The Chapman standard would apply. But the California Court of Appeal didn't use that. They used Watson, which is the state law prejudice standard. And that's what the district court seized on as getting us past EDPA's deferential standard of review. I think the district court was right about that, and there are quite a few problems with how the California Court of Appeal applied clearly established federal law here. And so I think the standard of review is just Brecht on prejudice. Fair enough. So I'm anticipating what they're going to say, so I'm going to ask it for you now. They're going to point to the broken light. They're going to point to the key. They're going to point to the library card, the grocery store card, and the story he gave about the Land Rover being stolen two months after the event. Walk me through why under Brecht you should prevail in this appeal in light of what we know is coming.  Absolutely. So, I mean, I think it's important to remember that Brecht – we don't have to be certain there would have been a different outcome at trial, but we do have to have grave doubt, and I think that's here. I think the evidence against Hewley, like I said, it really fills this hole in the theory of the case that the prosecution never could. I think that we also have the third trial here. So we don't have to speculate necessarily. We know there was this other trial where a little bit of this evidence came in. Again, Claudius Johnson says, I saw this gang member coming after my brother three days before the crime happened, and the jury hung there. I anticipate the other side pointing out that it's 11 to 1. That's true, but that's all it takes. That's all it takes for Brecht too. Do we have grave doubt as to whether one juror would have tipped? And that happened once before, and, I mean, if all this evidence came in, I think it would have happened again. But I guess what I'm asking – and maybe this is not a fair question, but I get to ask unfair questions. How would you explain – again, the burden is not on you, but we're trying to assess. It's one of these things where we're trying to assess what would have happened. So it helps me to understand what would be the explanation for the broken light that matches, the DNA, the library card, the story about the Land Rover. Like the car – it's being the same car, and he's – the people ID the car, and he's driving it after the event. How do we explain that away? I think first I'd point to his apartment is just absolutely trashed when police get there. And so I think it's very plausible that someone broke in. They got the keys. They had his stuff on them because that's really – it's Mr. Brown's property that's there. But the only evidence that says he was there is Claudius Johnson's identification. He admits he lied in court before, and he's made a whole bunch of identifications in this case. As to the Land Rover, I mean I think that's really tangential evidence here. Yes, he reported it stolen more than a month after the crime occurred. He says it broke down on the highway and a tow truck took it, and they never gave it back to him. There's certainly shady tow truck operators out there. That's not like a totally implausible story. What about the Cadillac? To me, that's the worst part of the case for you. Your Honor, I don't necessarily disagree with that, but I think first of all, it's still possible that someone else was driving it that day. This is a few days later. I can't have an explanation for how he got it back, but he didn't need to explain that. No, and that's going to be my question for them. But I just – it helps me see like what – because we have to do this weighing. That's what the Supreme Court says. So okay, so Land Rover I got. The keys I got. The Cadillac is tricky, but look, the burden is not on you. I mean I think that's the bottom line. The burden is on them. Fair enough. And, Your Honor, just since I'm running to the end of my time here, just a quick moment on the equitable tolling analysis. Although, to be fair, we have to reach the merits first I think because the district court did decide those. Mr. Brown was transferred to a new facility just before his limitations period started under AEDPA. He was transferred without his property, and he was placed in a mental health crisis bed and then moved to the psychiatric inpatient program. So I think that shows that he's quite clearly going through some sort of very serious mental health crisis there. He was transferred without any of his property. That includes his legal files. I know my colleague in his brief points to his petition and that it does not have a lot of information in the claims section or supporting evidence. And I'd just like to point out that in Espinoza-Matthews, which we rely on quite a lot in our brief, the magistrate judge in that case actually recommended denying or dismissing the petition because the defendant had not said what documents he was missing and how they would have applied to his petition. And this court, after the district court adopted that recommendation, rejected that and said that a petitioner with no access to his legal files, unrepresented, without help like Mr. Brown, just can't be expected to file a meaningful petition. And so that is the type of extraordinary circumstance that can warrant equitable tolling. And I'll reserve the rest of my time. Very well. Thank you. Good morning, Your Honors. May it please the court, Deputy Attorney General Herb Tedda from behalf of Respondent. I'll begin with the third-party culpability claim. And I think it's important to point out right at the beginning the standard of view is very important. And in this case, the claim fails under Section 2254D1. The district court in the case erred by finding that the California Court of Appeal did not reject the constitutional claim. The California Court of Appeal said the trial court's ruling, even if it was error, did not amount to a constitutional violation of petitioner's right to present a defense. So it explicitly rejected the constitutional claim. So the question now is, under Section 2254D1, whether that was an unreasonable application or contradiction of any clearly established Supreme Court precedent. Well, the clearly established Supreme Court precedent is Holmes v. South Carolina. That's the precedent regarding third-party culpability evidence. The California Court of Appeal in this case quoted Holmes. And it quoted Holmes for the proposition that rules that permit the exclusion of third-party culpability evidence on the ground that the probative value is outweighed by the prejudice or confusion of the issues are constitutional, and that this applies to third-party culpability evidence. And it affirmed the constitutionality of rules like the California's Hall Rule that allows the discretionary exclusion of third-party culpability evidence on the ground that it does not sufficiently link the perpetrator to the crime. So the rule that was applied in this case is one that Holmes v. South Carolina specifically approved of. So the California Court of Appeals determination that the ruling in this case did not violate the constitution after, in fact, cited Holmes is reasonable under 2254D. So let me just – just so I understand your argument. As I read the California Court of Appeals case, they assumed there was an error. Am I missing that? So what they did was they did not find error. They – under the state court – they assumed for purposes of the state court rule. Right. They said, assuming arguendo there was error, the trial courts that the – any error was harmless under state law standard. So it assumed it for purposes of argument and then went on and evaluated under the state law standard, which is quite common. Courts will sometimes do that. It's easier to dispose of on the harmless error prompt. So it did that. Then after it found that the error was harmless under the Watson standard, then it addressed the constitutional claim. I see. I follow you now.  And this is at excerpts of record, page 37. And the California Court of Appeals, after it did a state law analysis, said, contrary to Brown's assertion, the trial court's ruling, even if it was erroneous, did not amount to a constitutional violation of his right to put on a defense. So the district court, I think, got it wrong here in claiming that the California Court of Appeals, one, never addressed the constitutional claim. It clearly did. And number two, that it mistakenly addressed the constitutional claim by applying the Watson standard to a federal claim. That's not what happened. There's three parts to the opinion. The first is, assuming arguendo there was error under state law, first part. Second part was harmless under the Watson state law harmless error standard. And the third part was no federal constitutional violation. So I ask the court to look carefully at this because I think the district court got it wrong. So let's assume I make another assumption like you said courts like to make assumptions. Agreed. So let's assume that the district court correctly answered that. And I'm not asking you to concede that. Just assume it. On the harmless error, which is where the district court spent most of its time, you've heard the arguments from opposing counsel as to why it was harmful. They point to the third trial, et cetera. Walk me through why he's not correct on that. Certainly. Well, first of all, I want to point out that counsel points out that there were four trials. The first two trials didn't have anything to do with the jury being unable to reach a verdict. It was only the third trial. And, yes, it was 11 to 1 for conviction. But we don't know why there wasn't a conviction in the third trial. The third party culpability evidence was not presented in the third trial. What was presented was evidence that the main eyewitness had identified several other people, including Hughley. But it was never the theory that Hughley was the perpetrator in the third trial. What's more, in the trial that resulted in conviction, there was evidence presented that the eyewitness identified other people other than Petitioner. And evidence that another person had actually threatened the victim the day before and issued a gang challenge. So, yes, there was no naming of the individual in the fourth trial. But the evidence between the third trial and the fourth trial was not that different. What's more, I think the evidence is really overwhelming in this case. As the court pointed out, there's DNA and scientific evidence linking Petitioner to the crime. His apartment key was at the crime. The key to his car was at the crime scene. He had a library card and DNA or a library card and supermarket card there with his DNA on it. So he's connected to the crime, to the physical evidence. Then the perpetrator leaves in his Cadillac, the same car that he stopped in three days later that has the same damage to it as damage that was done at the crime scene. And Petitioner never offered any evidence to explain how it was that these items were left at the crime scene. His items with his DNA or how the perpetrator left in his car. The only thing that they relied on was the fact that when the police entered his apartment sometime later, it was a quote unquote disarray. That was it. There was no evidence of a burglary. They didn't find that there was a burglary. They essentially found that Petitioner's apartment was messy. And from that, defense counsel suggested, well, maybe someone went into his apartment, got his items and left them at the crime scene. But there was no evidence whatsoever to support that. It was just purely a hypothetical. And in order for that hypothetical to even been true, somebody had to engage in some elaborate scheme to frame Petitioner to get his personal items with his DNA on it. Leave it at the crime scene, somehow get his car there and drive his car away from the crime scene. And the defense presented zero evidence to explain how that could have happened. So I think here that certainly it's overwhelming evidence to show he was there. And then the eyewitness identification of Petitioner is corroborated by all this physical evidence that is there. And the eyewitness said that he saw Petitioner driving in his Cadillac around the block several times. So he recognized him because he had seen him in the neighborhood. So the defense, the defense evidence pointing to Hughley was extremely weak. The difference between the third trial and the fourth trial was there was very little difference there. And the defense never really explained away any of this evidence. So I think the claim clearly fails under Brecht. But I also want to emphasize that the claim also fails under 2254 D1. I think the district court did not correctly analyze that. And as I also brought up in my 28J letter, the United States Supreme Court recently, last week or the week before, in Klein v. Martin, again discussed the deference that's owed under 2254 D and explained that a state court must really blunder. They must really get it wrong or no fair-minded jurist could disagree in order to grant relief. Well, the court's opinion here was very carefully tracked Holmes v. South Carolina and quoted it at length. And then based on Holmes said there was no constitutional violation because discretionary exclusions of third-party culpability evidence on the ground that the evidence does not sufficiently link the perpetrator to the crime are constitutional. Holmes said so. And the California Court of Appeals relied on that. So I think this case falls, fails under both prongs. I'd like to just briefly adjust the timeliness argument as far as the equitable tolling. Again, I'd ask the court to look at the federal petition in this case. And it is basically a one-sentence claim that is the same claim that Petitioner presented in several prior state habeas and federal habeas corpus petitions. So he never provided a reason why he would have needed his legal files to present that claim. And as far as any mental health issue for equitable tolling, I'd ask the court to look at excerpts of record page 43. That's the traverse where Petitioner presented his equitable tolling claim. And it is one paragraph comprised of two sentences. It says basically that the deadline may be tolled during a period in time in which Petitioner lacks access to his legal files. Then he says that prison officials placed me in administrative segregation prison hospital and held my property, including my legal papers, for almost two years. So there's never a mention in there of any mental health issue, being in a mental hospital, or that anything related to mental health precluding him from being able to file his petition. So while the exhibits may show that when he was requesting his legal files, he was in a mental health unit, I don't think that's sufficient. Because even if we construe the allegations liberally, there's simply nothing there to construe as showing that he's relying on mental health for equitable tolling. For that reason, the district court's judgment should be affirmed. All right. Thank you, counsel. Appreciate it. Thank you. Your Honors, I'll try to make it quick. But just a couple of points. First, I think if you look at the California Court of Appeals opinion, this is as to EDPA deference. It's pretty clear that they're just talking about the facial validity of balancing test rules like California Evidence Code 352. Because they say in the very next sentence, after the one that my colleague highlights, that as a general matter, these types of tests are constitutional. Well, the problem is there's also chambers. And Lunbury says this very clearly. If probative admissible evidence is excluded that somebody else committed the crime, that falls under chambers. And so once the California Court of Appeals assumes that there was an error and that this evidence should have been admitted, then chambers kicks in. And this becomes constitutional error. There's, I don't think, excuse me, any way around that. And to speak to Klein, the new Supreme Court case, the problem there is that the Fourth Circuit, I believe it was, is nitpicking too much. It's saying, you know, state court, you say you're using the right standard. But here's some evidence that you should have talked about and you didn't. So we don't think you did. That's not the problem here. This is much clearer than that. So I think we do get past EDPA. And we should be looking at prejudice here, really. Now, as to that, I think a little bit of this evidence did come in at the third trial. And that's all that was needed. Defense theory at that trial, the attorney for the defendant says at closing, there should be this 17- to 19-year-old guy who is the other suspect sitting in that chair. He's talking about the defendant's chair. So I think he did rely on this. Now, Hewley's name is not a big part of that theory. A name is nice, but it's not what's needed here. It's a discrete alternate suspect that was there at the third trial. It wasn't at the fourth. And that, I think, made all the difference. Also, as to the first two trials, I'd point out that apparently all this evidence was allowed in at the second trial. And that's the one that the prosecution voluntarily dismissed, it seems, because a witness was apparently unavailable. But also maybe, of course we don't know, because this was a problem for them. I think as a last point, I'd just say the theory of Hewley committing the crime doesn't have to be that elaborate. It's just he stole Mr. Brown's stuff and he dropped it at the scene. That doesn't have to be intentional, some kind of elaborate conspiracy he's setting up. It could have been an accident. I mean that's what they're saying Mr. Brown did is he accidentally dropped his keys at the scene. It easily could have been Hewley as well. And I see that my time's up, so unless your honors have any questions. Thank you very much. Thank you very much, counsel. Thanks to both of you for your briefing and argument in this case. Very helpful. This matter is submitted.
judges: OWENS, VANDYKE, THOMAS